581 So.2d 321 (1991)
Karen HOWARD, Plaintiff-Appellee,
v.
CITY OF ALEXANDRIA, Defendant-Appellant.
No. 89-1330.
Court of Appeal of Louisiana, Third Circuit.
May 22, 1991.
*322 Edward Larvadain, Alexandria, for plaintiff-appellee.
Gold, Weems, Bruser, Sues & Rundell, Peggy St. John, Alexandria, for defendant-appellant.
Before FORET, YELVERTON and KNOLL, JJ.
FORET, Judge.
The issues in this case are whether Earl Hoover, Jr. was acting in the course and scope of his employment with the City of Alexandria, defendant-appellant herein, at the time of the accident, and whether the general and special damages, awarded to Karen Howard, plaintiff-appellee, are excessive.
This suit for personal injury and special damages arose out of an intersectional collision on September 25, 1986, between a vehicle driven by Karen Howard and a truck owned by the City of Alexandria and being driven by its employee, Earl Hoover, Jr. The accident occurred when Hoover rolled through a stop sign and was struck by Howard, who enjoyed the right of way. The trial court's finding that the sole cause of the accident was the negligence of Hoover has not been appealed.
In affirming the judgment of the trial court, we adopt our brother's excellent reasons for judgment, in pertinent part, as follows:

EMPLOYER'S VICARIOUS LIABILITY
"Earl Hoover was not joined as a party defendant in this suit; nor was any insurance company which may have had liability insurance on the vehicle driven by Hoover at the time of the accident. Accordingly, a determination of whether or not Mr. Hoover was in the course and scope of his employment at the time of the accident is the pivotal question of recovery in this case.
"It is undisputed that on the date of the accident Earl Hoover was an employee of the City of Alexandria. He was assigned to the Park Department and his primary duties involved maintenance at the various ball fields owned by the City. On the day of the accident he was assigned one of six trucks the City had available for work in the park areas. Four of these trucks were equipped with radios, and two were not, including the one Mr. Hoover was driving on the date of the accident. Irving Sias, also an employee of the City, assigned to the same duties as Mr. Hoover, was working with Mr. Hoover on this date and was a guest passenger in the City truck at the time of the accident. Mr. Sias' testimony reflects that he and Mr. Hoover and other City employees assigned to these duties work from 7:00 A.M. to 3:30 P.M. each day. Normally they were given a thirty minute lunch break during these hours, but occasionally, and especially when baseball tournaments were going on, this lunch break was not available. Also normally, the lunch break started at 11:30 each day. However, this varied and they were usually advised by a supervisor when they could go to lunch. Employees assigned vehicles were authorized to use the vehicles during their lunch break and generally transported those employees who were assigned to work with them to and from lunch. While on lunch break, employees were subject to being called back to a job site at any time and according to Mr. Sias this had occurred *323 on occasions when he was in a City truck equipped with a radio.
"On the date of the accident Mr. Sias was working with Mr. Hoover out of the truck assigned to Mr. Hoover. At approximately 11:15 A.M. their supervisor advised them that they could go to lunch at 11:25 A.M. At approximately 11:27 A.M. Mr. Hoover and Mr. Sias left for lunch in the City truck and the accident complained of occurred at approximately 11:30 A.M.
"As a general rule, our courts have held that an employee is not within the course and scope of his employment while going to and from lunch. McGee v. State Farm Mutual Automobile Insurance, 428 So.2d 1287 (La.App. 3rd Cir.1983); Laird v. Traveler's Indemnity Company, 236 So.2d 561 (La.App. 4th Cir.1970).
"On the other hand, where an employee is driving his employer's vehicle at the time of the accident, there is a presumption that he is acting in the course and scope of his employment, which presumption can be rebutted only by strong and convincing evidence to the contrary. Taylor v. Dupree, 484 So.2d 986 (La.App. 3rd Cir.1986), Windham v. Security Insurance Company of Hartford, 337 So.2d 577 (La.App. 4th Cir. 1976), writ denied, 341 So.2d 407 (La.1977).
"In both the McGee and Laird cases the employee, on his lunch break, was operating his personal vehicle. In the Taylor case, as in this case, the employee was operating his employer's vehicle. Although in Taylor the question of whether or not the employee was in the course and scope of his employment at the time of the accident was more obvious than in this case, the court nevertheless feels that use of City vehicles by its employees during a short lunch break distinguishes this case from the McGee and Laird situations. The City not only acquiesced in but authorized the use of its vehicles by employees for this purpose. In essence, the City was providing transportation for its employees to get lunch. The employees would leave the work sites in City vehicles when authorized to do so and would return to that site or a newly designated site at the conclusion of their lunch. The benefits of this arrangement to the City are obvious. If the employees had to be transported back to a central location to pick up their own vehicles to go to lunch and then return to that location after lunch to be transported back to their respective work sites, the City would lose considerable worktime in transportation. In effect, what the City has done is choose to provide transportation for its employees to and from lunch locations. If the City had provided a bus or large passenger van to pick up employees from various work sites and transport them to a lunch location, there would be no question but that the driver of that vehicle was in the course and scope of his employment while driving the bus or van to or from the lunch location. Part of the driver's duties would be to transport employees to and from lunch. On a smaller scale, Mr. Hoover was transporting himself and Mr. Sias to a lunch location at the time of the accident in City provided transportation. The fact that the time of the lunch break was subject to change depending on the amount and progress of work involved and the fact that the employees were still under the control of the City during their lunch break, emphasizes the convenience and benefit experienced by the City under this arrangement.
"In Michaleski v. Western Preferred Casualty Company, 472 So.2d 18 (La.1985) our Supreme Court concluded that an employee who had left his employer's work site to get a meal was in the course and scope of his employment when an accident occurred while he was returning to the work site. The court stated:
`Among the factors to be weighed to [sic] determining an employer's responsibility for the tort of an employee are the time, place, and purpose of the act in relation to service of the employer, the relationship between the employee's act and the employer's business, and the reasonable expectation of the employer that the employee would perform the act.'
"The accident occurred during normal working hours while Hoover was on a mission expected and contemplated by his employer, in a vehicle furnished by his employer. *324 Use of the vehicle was a convenience to the City which benefited from the arrangement. There was no deviation from this mission which was still in progress at the time of the accident. Hoover was still in the service of his employer at the time of the accident and the City is liable for the consequences of his negligent acts.

"QUANTUM
"Although plaintiff did not immediately complain of injury to the officer who investigated the accident, she did seek medical treatment on the day of the accident from her family physician, Dr. Charles Joiner. Dr. Joiner saw plaintiff on a periodic basis from the date of the accident on September 26, 1986 until December 2, 1986 during which time he treated her conservatively, that is, with muscle relaxants, anti-inflammation medications and moist heat for what he diagnosed as cervical and lumbar strains. During the course of this treatment plaintiff complained of intermitent [sic] numbness in her extremities and Dr. Joiner was of the opinion that this might be secondary to the interaction between her nerves and injured muscles. As her muscle pathology generally improved and she continued to experience numbness, he felt that her complaints may be caused by an anxiety overlay and added an anti-anxiety medication to her treatment. He did not give her a follow-up appointment after the visit of December 2, 1986 feeling that she was improving satisfactorily.
"Plaintiff returned to Dr. Joiner on December 30, 1986 complaining again of soreness in her neck and back, soreness in her left knee and leg and numbness in her left arm. He was of the opinion that she had suffered a recurrence of the muscle strains to her neck and back and that her numbness and pain in the left arm, knee and leg were again secondary to an interaction between her nerves and injured muscles. He increased the strength of her muscle relaxant and continued her anti-inflammation medication and moist heat.
"After a visit on January 13, 1987 at which plaintiff expressed the same complaints, he restarted her on an anti-anxiety medication.
"Plaintiff had approximately the same complaints on her visits to Dr. Joiner on January 26 and February 9, 1987 and Dr. Joiner made appointments for plaintiff to be examined by Dr. Foster, an orthopedic surgeon, and by Dr. Naalbandian, a neurologist.
"Dr. Foster examined plaintiff on February 17, 1987. Dr. Foster did not testify, but submitted a report to Dr. Joiner which in part was introduced through Dr. Joiner's testimony. According to Dr. Joiner, Dr. Foster's report stated that:
`At the present time I cannot find anything wrong with the young lady. I do not deny that she has pain, however, physically I did not find anything. I told her that she probably had a sprain or strain, which will resolve with time.'
"Dr. Naalbandian first saw the plaintiff on March 26, 1987. Based on her complaints, he ordered a CT scan and performed electromyographic and nerve conduction studies. All of these were negative for evidence of any nerve injury. It was Dr. Naalbandian's opinion that plaintiff's injuries were muscular-skeletal and he continued conservative treatment for these injuries. On April 28th Dr. Naalbandian recommended physical therapy and plaintiff submitted to these treatments three days a week for approximately two months. Dr. Naalbandian saw the plaintiff on a monthly basis until July 9, 1987, after which time he scheduled follow-up appointments on a four month basis and saw plaintiff again on November 30, 1987 and April 18, 1988. He has not seen her since that time.
"On the April visit Dr. Naalbandian noted that plaintiff still had some intermittent complaints of pain but that her condition had generally improved and that the numbness she had previously experienced was basically resolved.
"The only other treatment plaintiff sought between the date of accident and time of trial was a chiropractor whom she saw on one occasion while under treatment by Dr. Joiner.
*325 "On the date of trial on July 19, 1989, plaintiff testified that she still was experiencing problems with her left hand on lifting, had occasional problems with her back and had difficulty sleeping and doing household chores.
"Defendants argue that if plaintiff did sustain injuries they were at best minor and resolved themselves within about six or seven weeks at the most. They point to the fact that the damage to her vehicle was extremely minor and that she failed to complain of pain or injury at the scene of the accident. They point out that none of the physicians examining and/or treating plaintiff found any objective signs of injury and that her medical treatment was based entirely on her complaints.
"While these are certainly facts of this case, the court notes that all of the physicians who examined plaintiff felt that her complaints of pain were sincere. Likewise, the court has no reason to doubt that this college educated young woman was doing anything in pursuing the medical treatment documented in this case other than trying to resolve the pain and physical problems she was experiencing. It may well be that her anxiety exacerbated and prolonged her physical injuries. However, this does not make them any less real or compensable.
"It appears that plaintiff suffered from soft tissue injury intermittently, of a mild to moderate degree for approximately one year duration; and apparently was continuing to experience occasional mild discomfort at the time of trial two and a half years after the accident. There's no permanent injury and these symptoms should completely subside.
"A review of the cases on awards for similar injuries submitted by plaintiff and defendant in their respective briefs, indicates that plaintiff's injuries in the instant case lie somewhere between those submitted by the parties. The court is of the opinion that an award of $10,000.00 will adequately compensate plaintiff for her physical and mental pain and suffering.
"In addition, plaintiff is entitled to recover the following medical expenses:

1. Dr. Arsham Naalbandian $ 575.00
2. St. Francis Cabrini Hospital 539.70
3. Cenla Physical Therapy 1,095.00
4. Dr. Charles Joiner 520.00
5. Alexandria Orthopedic Clinic 194.00
6. Rapides Radiology 216.00
7. Dr. Alexander & Buckley 25.00
8. Dr. Dean Lindsay 105.00
9. Prescriptions 198.47
 _________
 TOTAL $3,468.17

"Expert witness fees are awarded for Dr. Joiner and Dr. Naalbandian, both of whom testified by deposition, at the sum of $100.00 each, said fees being fixed as costs. Also fixed as costs are the bills of M & S Court Reporters, Inc. for taking and transcribing these depositions, said bills being $114.00 for the deposition of Dr. Joiner and $68.40 for the deposition of Dr. Naalbandian."

CONCLUSION
Based upon the foregoing, the judgment of the trial court is affirmed. Defendant-appellant, City of Alexandria, is cast with the costs of these proceedings.
AFFIRMED.